Joshua M. Lurie, Esq. (0788)
Lurie|Strupinsky, LLP
147 74th Street
Brooklyn, NY 11209
(347) 770-7712
(347) 772-3074 (facsimile)
Attorney for Plaintiffs

| | |
|---|---|
| COMPLIANT DIALER, INC. (defunct),<br><br>Plaintiffs,<br><br>v.<br><br>RAUDY ULLOA; R U TECH, LLC; JOHN DOES 1-50; CORPORATIONS A-Z,<br><br>Defendants. | UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK<br><br>Civil Case No.<br><br>COMPLAINT AND JURY DEMAND |

Plaintiff, COMPLIANT DIALER, INC. a now defunct Delaware Corporation, by way of complaint against the Defendants, says:

**PARTIES**

1. Plaintiff Compliant Dialer, Inc. (hereafter "CDI") is a now defunct Delaware for-profit corporation with its principal place of business, at all times relevant, being in Westchester County, New York.

2. Defendant Raudy Ulloa ("Ulloa") is a former employee of Plaintiff, a resident of Brooklyn, Kings County, New York, and was terminated on or about January 19, 2018.

3. Defendant R U Tech, LLC (RUT) was formerly a contractor, upon information and belief, solely owned by Ulloa, and which provided services to CDI and an entity to which CDI merged (Avatar Outsourcing, Inc.) prior to Ulloa being retained as an employee.

4. Upon information and belief, RUT is a New York limited liability company which its principal place of business and registration being in Queens, Queens County, New York and

available for service via Registered Agents, Inc., 90 State Street, STE 700, Office 40, Albany, New York, 12207.

5. The John Doe and Corporation defendants are fictitious parties named herein because their identities are not currently known, and are used to represent the owners, operators, employees, directors, managers and individuals or business entities with controlling interests in Defendant R U Tech, LLC, if any such exist, or other unknown parties and whom or which, after discovery, may be determined to be partially or otherwise responsible for the harm which the Plaintiff suffered and therefore an amended Complaint would be necessary to name them.

## NATURE OF THE ACTION

6. This is an action brought, *inter alia*, the civil provisions of *the Computer Fraud and Abuse Act*, 18 U.S.C. § 1030(g), and for violations of the common law.

7. The common law claims arise under allegations of fraud and fraudulent conduct, violations and breaches of employment/consultant agreements, breaches of fiduciary duties and duties of loyalty.

8. Many of the common law claims arise under the permissive joinder provisions of Fed.R.Civ.P. 20, as the issues therein are intertwined with the statutory and federal claims, and a full adjudication of all issue against all parties would simplify the claims, eliminate the risks of contradictory rulings, and would be in the best interest of justice and judicial efficiency.

## JURISDICTION AND VENUE

9. This Court has Subject Matter Jurisdiction if this action pursuant to 28 U.S.C. §§ 1331 as some of the claims herein arise out of violations of the civil provisions of the *Computer Fraud and Abuse Act*, 18 U.S.C. § 1030(g).

10. The Court has Supplemental Jurisdiction, pursuant to 28 U.S.C. § 1367 for the New York statutory claims and the common law claims.

11. The Court has personal jurisdiction over Defendants as they are residents of the State and City of New York.

12. The Court has personal jurisdiction over Defendant RUT as it has a physical or otherwise commercial presence in the State and City of New York.

13. Venue is proper in this Judicial District under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claims herein are within this district.

## FACTS

### A. Ulloa's Background with Plaintiff.

14. In early 2012, Ulloa was first introduced to Plaintiff's owners/operators and or managers through another consultant named David Stewart ("Stewart").

15. Mr. Stewart had a long-term relationship with the principal owner of CDI who, in early 2012, was in the process of working, with others, in the creation of a startup software as a service company which would provide telemarketing services through specialized software operated overseas in the Philippines.

16. Stewart had previously worked for CDI's owner at a prior entity and, after Stewart's retention as an independent contractor for this prior entity, recommended Ulloa to provide technical and computer services.

17. In mid-2012, Ulloa and Stewart formed an entity called David TPO, LLC which served as the principal entity for providing the services that both Stewart and Ulloa provided to Plaintiff's owner's prior entity, Avatar Technologies, Inc. Phl., which was a Philippines for-profit

company and its U.S. contractually retained billing company, Avatar Technologies, Inc. (a Wyoming for-profit corporation) as well as another entity called Sales Technologies, Inc.

18. On February 19, 2014, Ulloa and Stewart separated their business interests, Stewart took possession of 39% of Ulloa's 40% ownership of David TPO, LLC and Ulloa formed RUT.

19. RUT was thereafter retained by these Avatar entities to provide the same service that Ulloa was performing through his prior entity, David TPO, LLP.

20. In March of 2015, Avatar Outsourcing was formed and, through various contractual agreements, became the billing system entity for the Philippines call center company and RUT and Ulloa began providing their services to Avatar Outsourcing.

21. In early 2017, Avatar Outsourcing merged with CDI.

22. Around that same time, Ulloa was hired by CDI to provide services as an employee.

23. By the end of 2017, due to various factors, including a series of lawsuits as discussed below, Compliant Dialer was in dire straits and was intending to downsize, substantially, as a result.

24. Ulloa was advised of the likelihood of his termination due to the downsizing which was forthcoming.

25. In January of 2018, Ulloa's employment with CDI was terminated.

**B.  The Stewart Litigations**

26. David Stewart, through David TPO, LLC, was providing bookkeeping, payroll and other accounting services for Avatar Outsourcing and other entities that had ownership or management, at least in part, by the same individual or individuals.

27. In late 2014, Avatar Outsourcing was beginning to find many discrepancies within its books that it could not readily reconcile, and which appeared to be done through the acts of Stewart.

28. In early 2015, a third-party was brought to Avatar Outsourcing to audit its books and, during this time, Stewart was barred from access to billing or accounting data. Ulloa was certainly aware of these activities, as he had an office in Avatar Outsourcing's office in Mt. Vernon, New York, had close personal and business relationship with all parties, and was involved in many of the discussions relating to the accounting issues due to the aforementioned close relationships.

29. By April of 2015, it was evident that Stewart had committed some form of malfeasance, though a full understand of how extensive the conduct would not become known until much later.

30. In mid-April 2015, Stewart's contractual work with Avatar Outsourcing was terminated. Shortly thereafter, Stewart traveled to the Philippines, violated certain non-compete agreements, and committed other conduct which Plaintiff deems improper.

31. Upon his return to the United States, Stewart attempted to extort funds from Avatar Outsourcing and its ownership, which resulted in cease and desist letters. Ulloa was aware of this conduct and Avatar Outsourcing's responses.

32. By the end of 2015, unbeknownst to many in Avatar Outsourcing, Stewart filed for unemployment insurance through the State of New York, which was denied by Avatar Outsourcing as Stewart was a contractor and not an employee.

33. Similarly, during 2016, Avatar Outsourcing, its owners/staff, and later CDI, became aware that Stewart was violating its registered trademarks by holding himself out to be the

owner of a company called Avatar Dialler, Ltd. (NB: Dialler with two "L's")  This resulted in the need to immediately file litigation against Stewart and his companies to protect and enforce its trademark AVATAR, which has been registered with the USPTO by this time.

34. Ulloa was questioned about his knowledge of Stewart's conduct during this time and provided information to CDI, Avatar Outsourcing and attorneys representing them.

35. Similarly, during this time frame, Stewart had posted several confidential business records of CDI, Avatar Outsourcing, and the Philippines entities on Facebook and was soliciting employees, current and former, to provide him with more stolen documents and was offering to pay these same classes of individuals to either steal documents or provide him with false affidavits.

36. In late 2016, Avatar Outsourcing filed a civil action in the Southern District of New York for, *inter alia*, trademark violations against Stewart and David TPO, LLC for various associated conduct under Case No. 7:16-cv-09337.

37. Shortly thereafter, Stewart filed what Avatar Outsourcing, and by that juncture CDI, describes as a frivolous case for alleged violations of the FLSA and as a class action under Case No. 1:17-cv-00565.

38. Similarly, in this time frame, Stewart had retained the same attorney as on his FLSA claims to represent him before the DOL on the unemployment case in which he was now claiming a systemic violation of employment law by CDI to violate New York employment laws to avoid tax payments.

39. To date, with these three matters, CDI has been forced to pay legal fees and costs well in excess of $150,000.00 since the beginning of 2017.

40. Among the various issues that CDI has been forced to handle in these three cases has been Stewart's production and reliance upon innumerable confidential business records to which CDI could not determine how Stewart had come into possession of them.

41. Similarly, on several occasions, Stewart advised that he was both struggling for money, yet had paid his lawyers upwards of $60,000.00 to litigate these matters – including $15,000.00 for the DOL hearings. CDI could not reconcile how Stewart was able to finance these matters.

42. At several times during these actions, CDI and its management met with Ulloa to discuss such Stewart-related issues as the business they formed the business together (David TPO, LLC) and their long-standing relationship.

43. Ulloa made promises to CDI and its management, that since he was an employee by that juncture, he would assist them in prosecuting or defending against these actions.

44. Filings were made to various tribunals with the representations of Ulloa with respect to what he would testify to.

45. Specifically, on multiple occasions, Ulloa advised anyone who would listen that he has had no contact with Stewart since Stewart left Avatar Outsourcing's offices in April of 2015, other than, perhaps once seeing him at a wedding.

46. CDI had no reason to doubt the representations made to CDI by Ulloa.

**C. CDI learns about the Frauds and Other Wrongful Conduct**

47. On January 13, 2018, CDI's experts in the "Trademark" case, performed a forensic review of Stewart's cell phone and computers specifically related to searching for some of the conduct which was alleged to have been performed by Stewart – *to wit*, the theft of records and posting of confidential information.

48. While performing this search, CDI was shocked to learn of ongoing conversations, via text messaging, between Stewart and Ulloa, starting at least in early 2015 and continuing until, at least, September of 2017 – with some messages being sent from Stewart to Ulloa in early December 2017 discussing, specifically, Ulloa likely being terminated.

49. The discussion contains a lot more inflammatory language within the discussion, including:

   a. Setting up a "workaround" for Stewart's phone to keep iCloud data which contains stolen documents;

   b. "Loaning" Stewart $10,000.00 with a promise of a return after the litigations addressed above to finance all of the lawsuits filed against Avatar Outsourcing;

   c. Contacting Stewart during the pendency of the litigation to provide notice of Ulloa's being pulled into the cases (suspiciously, only after he provided documentary evidence and support for CDI in the DOL hearings) and advising that he will not help Plaintiffs; and

   d. Telling Stewart that he will not testify on behalf of his employer unless subpoenaed, since it will harm his friend [Stewart].

50. Multiple references are made to other discussions therein, about which Plaintiffs do not have further knowledge

51. Other conversations therein with other current and former employees of Plaintiff discuss the conduct of Ulloa, including his acts as to the computer systems of Plaintiff and the investment he made to bring litigation against Plaintiff.

52. Ulloa was asked about his communications, again, and confirmed that he had not communicated with Stewart for years.

53. On January 19, 2018, Ulloa was called into management's office of CDI to be advised that he was being terminated.

54. Ulloa was, again, asked if he had any discussions or communications with Stewart which he then, again, denied.

55. Ulloa was asked to hand back his work computer and telephone.

56. Ulloa then left the office.

57. Shortly thereafter, CDI's management opened up the laptop returned to it to find that Ulloa has logged into the computer and erased its contents.

58. Thereafter, CDI attempted to open the returned cell phone to find that Ulloa was actively logged into the telephone, remotely, and was starting to delete its contents.

59. CDI shut the phone off to stop the continued deletion of the content of its system.

60. Thereafter, it attempted to reopen the telephone but was confronted with a password. Requests for the passcode/password for the phone have been made to Ulloa and his counsel but refused.

61. Upon information and belief, the documentation which was deleted from the computer and attempted to be deleted from the phone included confidential business records, including projects to which Ulloa was actively working on, as well as communications with Stewart, and potentially others, related to his cooperation and/or conspiring with Stewart, and possibly others, to cause harm to CDI and its management.

62. Indeed, the text messages, referenced above, indicate that there are at least four other individuals who were working with Stewart to cause harm to Plaintiff including at least one other who has filed a frivolous and defamatory action against CDI's management making innumerable false and inflammatory claims.

63. Thereafter, CDI received contact from one of its clients that they had been contacted, directly on their cell phone, and asked to leave CDI and work with a competitor which was founded by Stewart's co-conspirator(s) and is in the active litigation with Plaintiff as identified in the preceding paragraph.

64. This was a relatively new client and the only individuals who would have the client's cell phone number include active management at the time CDI was in business (closing the end of April 2018) and Ulloa.

65. Therefore, upon information and belief, Ulloa has provided, and has been providing, Plaintiff's client records to its competitors.

66. Ulloa's conduct shows a lack of fidelity and honesty in his dealings with his employer and, previously, his company's contractual partner(s).

67. Ulloa's conduct shows a breach if his duty of loyalty to his employer as would be customarily expected by an employee to an employer.  Indeed, in contrast, Ulloa's conduct evidences, at the least, an intent to cause financial harm to his employer or thwart its ability to actively and properly prosecute its legal claims or defend against legal claims made against it.

68. Ulloa's remote or other access to Plaintiff's computers and/or telephone *after* access was revoked and deleted information is a violation of the Computer Fraud and Abuse Act.

69. Ulloa's conduct, while an employee and while acting through RUT, is corporate/industrial sabotage and espionage as Ulloa, alone or through RUT, was placed in a position of power and confidence, breached said confidence to cause harm to his contractual partner and, later, to his employer.

70. Similarly, Ulloa's conduct, as an employee, to provide information and promises to harm Plaintiff or refusal to testify on behalf of his employer, evidences a violation of his duty of loyalty to Plaintiff.

71. Finally, the theft of business records, whether to Stewart through RUT or afterwards, potentially after his termination, evidences corporate espionage.

72. Plaintiff has been harmed in an amount that is indeterminate and the harm is impossible to stop due to the conduct of Ulloa. Indeed, the amount appears to exceed $200,000 in direct harm and the value of the business to which Ulloa's conduct has harmed may exceed, easily, seven figures.

73. Thus, by virtue of Ulloa and RUT's conduct, Plaintiff has been harmed, damaged, and requests monetary and injunctive relief.

## COUNT ONE
### Civil Provisions of the Computer Fraud and Abuse Act (18 U.S.C. § 1030(g))
### (As to Defendant Ulloa)

74. Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

75. Defendant Ulloa was provided with a computer/laptop and cell/smart phone for his use solely for business purposes while employed.

76. Upon termination, he was directed to return such items. At that time, the right and authorization to access those items was revoked.

77. Upon termination, Ulloa accessed the laptop and erased its contents.

78. Similarly, after termination, Ulloa remotely accessed the smartphone and attempted to erase its contents.

79. The contents, upon information and belief, include evidence of fraud or otherwise evidence of collusion or conspiracy with other third-parties to which Plaintiff is in active litigation related to, *inter alia*, theft of business records, corporate espionage and trademark infringement.

80. Ulloa also placed a password on the smartphone and has refused to provide its password/passcode to Plaintiff so that Plaintiff may access its property and determine what is contained within its electronic property.

81. The conduct of Ulloa in accessing these systems after access was revoked was to cause damage to Plaintiff.

82. Ulloa's conduct has caused damage to Plaintiff, either intentionally, negligently or recklessly.

83. As a result of Ulloa's conduct, Plaintiff has suffered financial damages in excess of $5,000.00.

84. Similarly, equitable relief is necessary to compel Ulloa to provide access to the Smartphone such that Plaintiff may obtain the records kept therein and determine whether Ulloa further transmitted business records to third-parties.

**COUNT TWO**
**Breach of Fiduciary Duty**
**(As to Defendant Ulloa)**

85. Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

86. Ulloa, employed by Plaintiff, was also in a position of trust as to Plaintiff.

87. Under the common law, Defendant Ulloa had a duty to act in good faith and not to commit acts of fraud, bad faith or other misconduct as to his employer and, as to all times relevant herein, owed a fiduciary duty to Plaintiff.

88. Ulloa, among other acts, violated his duty to Plaintiff by, *inter alia*: funding litigation against his employer and failing to disclose such conduct; advising adversaries in litigation strategy related to litigation to which he was a party in the discussions and planning; refusing to provide truthful testimony in favor of his employer as it would harm his coconspirator; and providing numerous false statements to Plaintiff with respect to his relationship and contact with David Stewart with whom he knew was involved in litigation.

89. Similarly, upon termination, new clients of Plaintiffs were contacted by other co-conspirators of David Stewart on their personal numbers and solicited to remove their business with Plaintiff and transfer it to these co-conspirators. The only individual who had access to this information outside of a select few individuals, and also the only individual who had contact with these co-conspirators of David Stewart, was Defendant Ulloa.

90. By transferring of business records to third-parties, Ulloa violated his fiduciary duty to Plaintiff.

91. As a proximate cause of Ulloa's conduct, Plaintiff has suffered damages in amount to be determined at the time of trial, but in excess of $300,000.00, with interest, and reimbursement of legal fees and costs.

92. Plaintiff is also entitled to a full accounting of all income Ulloa derived from his violations as set forth herein as well as an accounting of all loans he made to parties which have been used to fund litigation or other conduct to harm Plaintiff.

### COUNT THREE
### Breach of Contract and Implied Covenant of Good Faith and Fair Dealing
**(As to Defendants Ulloa and R U Tech, LLC)**

93. Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

94. As initially an independent contractor, and then hired full time, both Ulloa and RUT had an obligation to comply with the implied covenant, existing in every contract, of good faith and fair dealing with relation to the other parties to the contract, whether the contract was written or oral.

95. The conduct of Ulloa, while providing services to Plaintiff and others related to Plaintiff's management through RUT and later to Plaintiff both through RUT and as an employee, evidenced bad faith and failure to comply with the obligation to deal fairly with Plaintiff.

96. Among the conduct of Defendants which evidence such conduct is the funding of litigation against Plaintiff as instituted by Defendant's friend and/or co-conspirator David Stewart by way of an investment.

97. Defendants conduct, acts and omissions, as alleged above, constitute a breach of the obligation to act in good faith and deal fairly with Plaintiff.

98. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has been damaged in an amount to be proven at the time of trial, but in excess of $300,000.00 along with interest and counsel fees and costs.

99. Plaintiff is also entitled to a full accounting of all income Ulloa and/or RUT derived from the violations as set forth herein as well as an accounting of all loans he made to parties which have been used to fund litigation or other conduct to harm Plaintiff.

## COUNT FOUR
### Corporate/Industrial Espionage
**(As to Defendants Ulloa and R U Tech, LLC)**

100. Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

101. While providing services to Plaintiff through RUT or in his individual capacity as an employee, and contrary to the representations made to Plaintiff, Ulloa was providing assistance to competitors of Plaintiff, including David Stewart. This assistance included providing information about strategy (including litigation) and financial assistance to fund litigation against Plaintiff.

102. Similarly, and upon information and belief, Ulloa transmitted confidential business records and trade secrets, including client lists and contact information, to competitors of Plaintiff either while employed or shortly after termination.

103. Upon information and belief, during his time providing services to Plaintiff, either through RUT or as an employee, Ulloa collected valuable information which was provided to third-parties to the detriment of Plaintiff.

104. As a direct and proximate result of Ulloa's conduct, Plaintiff has been damaged in an amount to be proven at the time of trial, but in excess of $1,000,000.00 plus counsel fees and costs.

### COUNT FIVE
### Tortious Interference
### (As to Defendants Ulloa)

105. Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

106. Upon termination, customers of Plaintiffs advised that they were contacted on their personal cell phone by a competitor of Plaintiff.

107. The only individual who had the client contact information and contact with the co-conspirators of the competitor is Defendant Ulloa.

108. Upon information and belief, Ulloa provided the contact information to third-parties with the intention to interfere with Plaintiff's contractual relationships with its clients.

109. The interference was intentional and without justification.

110. As a direct and proximate cause of Ulloa's tortious interference, Plaintiff has been damaged in an amount to be proven at the time of trial, but not less than $100,000.00 plus punitive damages and interest.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ulloa and RUT as follows:

A. Compensatory damages of at least $5,000.00 on the CFAA claims;

B. Compensatory damages of at least $400,000.00 on Counts Two, Three and Five;

C. Compensatory damages of at least $1,000,000.00 on Count Four;

D. Punitive damages;

E. Injunctive relief compelling Defendants to provide access to Plaintiff's property to which Defendant placed passcodes;

F. Equitable accounting;

G. An award of counsel fees and costs of suit;

H. Pre-judgment and post-judgment interest; and

I. Any other such relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues presented herein.

Dated: April 27, 2018
      New York, New York

                                            Respectfully submitted,

                                            _/s/ Joshua M. Lurie_____

                                            Joshua M. Lurie, Esq. (JL0788)
                                            Lurie|Strupinsky, LLP
                                            147 74th Street
                                            Brooklyn, New York 11209
                                            Ph. (201) 831-1086
                                            Attorney for Plaintiff
                                            jmlurie@luriestrupinsky.com